**[ORAL ARGUMENT NOT SCHEDULED]**

**Nos. 26-5224, 26-5322**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JOYCE BEATTY,

Plaintiff-Appellee,

v.

DONALD TRUMP, et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the District of Columbia

# BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

BRANTLEY T. MAYERS
*Attorney*
*Civil Division, Room 3338*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530*
*(202) 890-9874*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Plaintiff-appellee is Joyce Beatty. Defendants-appellants are the following individuals in their official capacity as trustees of the John F. Kennedy Center for the Performing Arts—Donald J. Trump, Jennifer Fischer, Sergio Gor, John Falconetti, Brian D. Ballard, Maria Bartiromo, Pamela Bondi, Mary Helen Bowers, Hannah F. Buchan, Robert Castellani, Elaine Chao, Pamella Roland Devos, Patricia Duggan, Emilia May Fanjul, Lynette Friess, Pamela Gross, Lee Greenwood, Kate Adamson Haselwood, Laura Ingraham, Michele Kessler, Dana Kraft, Mindy Levine, Lynda Lomangino, Barbara Long, Allison Lutnick, Douglas Manchester, Catherine B. Reynolds, Denise Saul, Dan Scavino, Cheri Summerall, Usha Vance, Susie Wiles, Andrea Wynn, Paolo Zampolli, Robert F. Kennedy, Jr., Marco Rubio, Linda McMahon, Mike Johnson, Sam Graves, Julia Letlow, Mike McCaul, John Thune, Shelley Moore Capito, and Susan Collins—as well as Matthew Floca (substituted for Richard Grenell) in his official capacity as the Executive Director and Chief Operating Officer of the John F. Kennedy Center for the Performing Arts, the Trustees of the John F.

Kennedy Center for the Performing Arts, and the John F. Kennedy Center for the Performing Arts.

The Committee for the First Amendment and a group of alumni of the President's Advisory Committee on the Arts, the Kennedy Center Board of Trustees, and the President's Committee on the Arts and Humanities participated as amici in the district court. Those individual alumni are: Mary Boyle, Guy Cecil, Gilbert R. Cisneros Jr., Bruce Cohen, Sylvia Davis White, Catherine Gledhill, Sonya Halpern, Sharon Hoffman, Barry Karas, Shahid Khan, Robin Leeds, Amalia Perea Mahoney, Noah Mamet, Ronnie Planalp, Deborah Dozier Potter, Diane Robertson, Rusty Rueff, Alexandra C. Stanton, Gary Sugarman, and Reginald Van Lee.

### B. Rulings Under Review

The rulings under review in this consolidated appeal are the opinion and order entered May 29, 2026 (ECF Nos. 49, 50), granting partial summary judgment to plaintiff and issuing a permanent injunction, *see Beatty v. Trump*, 834 F. Supp. 3d 841 (D.D.C. 2026) (Cooper, J.) (appeal no. 26-5224), and the opinion and order entered September 15, 2026 (ECF No. 77), enforcing the injunction, *see Beatty v. Trump*, No. 1:25-cv-4480, --- F. Supp. 3d ----, 2026 WL 2718566 (D.D.C. Sept. 15, 2026) (Cooper, J.) (appeal no. 26-5322).

### C. Related Cases

This case has not previously been before this Court or any other court. A case pending in district court—*DC Preservation League v. Board of Trustees of the John F. Kennedy Center for the Performing Arts*, No. 1:26-cv-981 (D.D.C.) (Cooper, J.)—involves some of the same parties and similar issues.

*/s/ Brantley T. Mayers*
Brantley T. Mayers

# TABLE OF CONTENTS


INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 4

STATEMENT OF THE ISSUES ........ 5

PERTINENT STATUTES AND REGULATIONS ........ 5

STATEMENT OF THE CASE ........ 6

A. Statutory Background ........ 6

B. Factual and Procedural Background ........ 7

SUMMARY OF ARGUMENT ........ 11

STANDARD OF REVIEW ........ 15

ARGUMENT ........ 15

I. Plaintiff lacks standing to challenge the Board's naming decisions, because she raises only a generalized grievance........ 15

II. The Board's decisions to recognize President Trump did not violate the Center's organic statute. ........ 23

III. The Board's bylaw amendment that clarified *ex officio* trustees' nonvoting status did not violate the Center's organic statute. ........ 38

IV. The equities do not support the permanent injunctions as to the December 2025 and August 2026 resolutions........ 41

CONCLUSION........ 44

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Alcresta Therapeutics, Inc. v. Azar*,
318 F. Supp. 3d 321 (D.D.C. 2018) ........................................ 42

*Am. Soc'y for Testing and Materials v. Public.Resource.Org, Inc.*,
896 F.3d 437 (D.C. Cir. 2018) ........................................ 15

*Bartko v. Sec. & Exch. Comm'n*,
845 F.3d 1217 (D.C. Cir. 2017)........................................ 33

*Barton v. Barr*,
590 U.S. 222 (2020)........................................ 37

*Bd. of Dirs., Wash. City Orphan Asylum v. Bd. of Trs., Wash. City Orphan Asylum*,
798 A.2d 1068 (D.C. 2002)........................................ 20

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................ 18

*Dellinger v. Bessent*,
766 F. Supp. 3d 57 (D.D.C. 2025)........................................42, 43

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)........................................ 15, 16, 19

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003)........................................ 18

*Greene v. Art Inst. of Chi.*,
147 N.E.2d 415 (Ill. App. Ct. 1957) ........................................ 20

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017) ........................................ 31

*Hollingsworth v. Perry*,
570 U.S. 693 (2013)........................................ 17

*Jackson v. Phillip*,
96 Mass. (14 Allen) 538 (1867) ........................................ 17

*Koon v. United States*,
518 U.S. 81 (1996) .......... 15

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
634 F.2d 1197 (9th Cir. 1980) .......... 42

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).......... 15, 16, 17, 19

*MobilizeGreen, Inc. v. Cmty. Found. for the Cap. Region*,
267 A.3d 1019 (D.C. 2022).......... 19

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010).......... 32, 41

*Mount Vernon Mortg. Corp. v. United States ex rel. Att'y Gen.*,
236 F.2d 724 (D.C. Cir. 1956) .......... 20

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*,
--- S. Ct. ----, 2026 WL 2564318 (2026) .......... 12, 22

*Nix v. Billington*,
448 F.3d 411 (D.C. Cir. 2006) .......... 15

*O'Brien v. Weld*,
92 U.S. 81 (1875) .......... 32

*Pileggi v. Washington Newspaper Publ'g Co.*,
146 F.4th 1219 (D.C. Cir. 2025) .......... 19

*Pub. Citizen, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
332 F.3d 654 (D.C. Cir. 2003) .......... 37

*Reuss v. Balles*,
584 F.2d 461 (D.C. Cir. 1978) .......... 34

*Rimini St., Inc. v. Oracle USA, Inc.*,
586 U.S. 334 (2019).......... 36

*Royal Canin U.S.A., Inc. v. Wullschleger*,
604 U.S. 22 (2025) .......... 22, 35

*Russello v. United States*,
464 U.S. 16 (1983) ............................................................28, 29

*Salazar v. Buono*,
559 U.S. 700 (2010)............................................................ 34

*Shelton v. King*,
229 U.S. 90 (1913) ............................................................ 44

*Sprint Communications Co. v. APCC Services*,
554 U.S. 269 (2008)............................................................22, 23

*Steeneck v. Univ. of Bridgeport*,
668 A.2d 688 (Conn. 1995)............................................................ 40

*Sw. Airlines Co. v. Saxon*,
596 U.S. 450 (2022)............................................................ 28

*Thole v. U.S. Bank N.A.*,
590 U.S. 538 (2020)............................................................18, 22

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)............................................................12, 16, 19, 21

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)............................................................ 44

*United States v. Regenerative Scis., LLC*,
741 F.3d 1314 (D.C. Cir. 2014)............................................................ 15

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................ 41

*Wis. Cent. Ltd. v. United States*,
585 U.S. 274 (2018)............................................................29, 31

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ............................................................ 42

**Statutes**

7 U.S.C. § 1627b(f)(3)(A) ............................................................ 40

12 U.S.C. § 1716b ........................................ 25

12 U.S.C. § 5491(a) ........................................ 26

20 U.S.C. § 76h ........................................ 1

20 U.S.C. § 76h(a)(1) ........................................ 6, 7, 34

20 U.S.C. § 76h(a)(2) ........................................ 6, 39

20 U.S.C. § 76h(b) ........................................ 6

20 U.S.C. § 76i ........................................ 3

20 U.S.C. § 76i(3) ........................................ 36

20 U.S.C. § 76i(a) ........................................ 23, 24, 35, 37

20 U.S.C. § 76i(c)(3) ........................................ 28

20 U.S.C. § 76j ........................................ 7, 19

20 U.S.C. § 76j(a)(1) ........................................ 7, 36, 43

20 U.S.C. § 76j(a)(2) ........................................ 6, 35, 37

20 U.S.C. § 76j(b) ........................................ 13, 35

20 U.S.C. § 76j(b)(1) ........................................ 23, 27, 29, 31

20 U.S.C. § 76k ........................................ 9

20 U.S.C. § 76k(a) ........................................ 23

20 U.S.C. § 76l ........................................ 12

20 U.S.C. § 76l(a) ........................................ 14, 38, 39

20 U.S.C. § 76l(b) ........................................ 6, 14, 23, 25, 39, 43

20 U.S.C. § 76q ........................................ 23, 24, 27

20 U.S.C. § 76q-1(a)(4) ........................................ 36

20 U.S.C. § 76i(4) ........................................ 36

20 U.S.C. § 76s ........................................................................................ 36

22 U.S.C. § 7302(b)(2)(A)............................................................................ 40

28 U.S.C. § 991(a)...................................................................................... 40

28 U.S.C. § 1292(a)(1) .................................................................................. 5

47 U.S.C. § 1423(b)(1)(A)............................................................................ 40

D.C. Code § 19-1307.03(f)................................................................ 12, 17, 22

D.C. Code § 19-1307.03(g) ................................................................ 13,18, 22

D.C. Code § 29-401.02(8)............................................................................ 40

Pub. L. No. 85-874......................................................................................... 6

Pub. L. No. 88-260......................................................................................... 6

Pub. L. No. 98-205....................................................................................... 28

Pub. L. No. 106-218..................................................................................... 25

**Other Authorities**

Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, *Bogert's The Law of Trusts and Trustees* § 585 (May 2026 update) ........................17, 21

Exec. Order No. 14347, 90 Fed. Reg. 43893 (Sep. 5, 2025) .......................... 25

Restatement (Second) of Torts § 874 (A.L.I. Aug. 2026 update) ................... 19

Restatement (Second) of Trusts § 224 (A.L.I. Oct. 2024 update)................... 18

Restatement (Third) of Trusts § 81 (A.L.I. Oct. 2024 update) ..................18, 33

Restatement (Third) of Trusts § 76 (A.L.I. Oct. 2024 update) ....................... 18

Restatement (Third) of Trusts § 85(1)(a) (A.L.I. Oct. 2024 update)..........25, 37

## GLOSSARY

| | |
|---|---|
| Board | Board of Trustees of the John F. Kennedy Center for the Performing Arts |
| Center | The John F. Kennedy Center for the Performing Arts |

## INTRODUCTION

The Kennedy Center is in state of collapse both financially and physically. The building has become dangerously dilapidated, outdated, and decrepit. As a result, it is fundamentally unsafe to employees and patrons alike. And the Center's finances are equally in disrepair. Like many arts and entertainment facilities, the Center has been losing tens of millions of dollars each and every year for decades, and it is projected to lose around $100 million per year long into the future. In short, both physically and financially, the Kennedy Center is in critical condition. To bring this sick and poorly run facility back to health will require time, energy, talent, and large amounts of money.

In its current state of decline, the Center cannot serve its purpose as the National Center for the Performing Arts, nor can it properly memorialize President Kennedy. As a result, upon taking office in 2025, President Trump, and the Trump Administration, prioritized saving and preserving the Center. The President obtained $258 million in funding from Congress for capital restoration and has marshalled a new donor base to finance an endowment for the Center. The Trump Administration also went to work on plans to rescue the Center from its catastrophic condition and make it a magnificent palace for the future. This is a task which President Trump, given his unrivaled expertise and experience in real estate and construction, and prominence as President, is

uniquely qualified to accomplish. And it is a task that will continue into the future. President Trump, and others in the Administration, will have to work very diligently for years to come to have the Center funded.

The Board has long recognized that President Trump's efforts and prestige provide the sole hope for the Center's financial survival and structural renewal. In December 2025, the Board voted to add President Trump's name to the Center. Despite the absence of any statutory impediment, and even though Plaintiff Representative Joyce Beatty lacked standing as an *ex officio* trustee, the district court enjoined the Center to remove President Trump's name. The district court also enjoined the Board from enforcing a bylaw amendment that made clear *ex officio* trustees lack voting rights.

This decision was wrong on both the merits and the equities, and the Board appealed. Simultaneously with the appeal, the Board returned to the drawing board. In June, the Board unanimously agreed to recognize the President, Plaintiff included. And then in August, the Board overwhelmingly voted to take three specific actions to recognize and acknowledge President Trump. Out of the two relevant to this appeal, Plaintiff explicitly stated that she had no objection to one of them—naming the site that contains the Center the "President Donald J. Trump Plaza." And the other—adding an inscription on

the front portico recognizing that the Center is "renovated and restored by President Donald J. Trump"—is equally lawful.

But the district court concluded that its first order—which enjoined only the addition of President Trump's name—prevented effectuation of the Board's August resolution too. This again was error. Contrary to the district court, Congresswoman Beatty cannot challenge the renaming of the Plaza—an action that she affirmatively stated at the Board meeting that she did not object to. And, in any case, the Board's vote was entirely lawful. No statute names the Plaza. And no statute prohibits the Board from naming it. Further, the recognition of the President's contributions does not constitute a "memorial" as that word is ordinarily understood in this context, and thus the statutory prohibition does not apply. The same is true of the planned inscription on the front portico. It does not rename the Center, nor is it a "memorial" to President Trump. Instead, it merely serves to acknowledge the Trump Administration's, and President Trump's, present and future efforts to renovate and restore the Center. Such acknowledgements of major donors are common at similar facilities, and Congress did not prohibit such a sensible recognition here.

The district court also misapplied the equities, which overwhelmingly favor Defendants. Plaintiff, a partisan bent on reflexively opposing President Trump at every turn, faces only abstract harms. On the other hand, the district

court's orders preventing the Board from appropriately recognizing President Trump will cause donors to flee, financial contributions to dry up, and structural rehabilitation to cease. There will simply not be the expertise or funding necessary to rebuild and renovate this decimated structure.

In short, without appropriate recognition, the Kennedy Center will be back where it was at the beginning—a financially insolvent facility and a decrepit, dilapidated, crumbling building, that is bleeding hundreds of millions of dollars in losses and that continues to race toward physical and financial ruin. The stakes are existential. Just this month, the Kennedy Center was only able to pay its bills thanks to 17 million dollars raised by President Trump that were infused into the Kennedy Center account to keep it afloat. But the funds are fast being expended, and without the Trump Administration, the accounts will dry up and Center will continue its deterioration into an unsafe structure that will eventually collapse, with a determination to follow on how to proceed, and what to do with the site. That is not in the public interest, and it should not be in Plaintiff's either. This Court should reverse the district court and allow the Board and President Trump to restore the Kennedy Center to greatness.

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. § 1331. JA40. The district court granted partial summary judgment to Plaintiff and

issued a permanent injunction on May 29, 2026. JA279-376. The government timely appealed that order on June 11, 2026. JA377. The district court entered an order enforcing the injunction on September 15, 2026. JA419-40. The government timely appealed that order the same day. JA441. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether Plaintiff, an *ex officio* trustee of the Kennedy Center, has standing to pursue this action.

2. Whether it violated the Center's organic statute for the Board (a) to adopt a secondary name referring to the Center as the "Donald J. Trump and John F. Kennedy Center for the Performing Arts," (b) to vote to erect signage on the exterior of the building acknowledging the President's efforts to restore the Center, and (c) to name the physical site and grounds upon which the Center sits the "President Donald J. Trump Plaza."

3. Whether the Board's May 2025 bylaw amendments—which clarified that *ex officio* trustees are nonvoting members—violated the Center's organic statute.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Statutory Background

Congress established the National Cultural Center in 1958. *See* National Cultural Center Act, Pub. L. No. 85-874, 72 Stat. 1698 (1958). Shortly after President Kennedy's assassination, Congress renamed the new entity the "John F. Kennedy Center for the Performing Arts." Act of Jan. 23, 1964, Pub. L. No. 88-260, 78 Stat. 4.

Congress also established a board of trustees of the Center. 20 U.S.C. § 76h(a)(1). Congress provided that the Board would contain thirty-six general trustees, who "shall be appointed by the President" for terms of six years. *Id.* § 76h(a)(2)(L), (b). Congress further provided that an array of individuals would sit as *ex officio* trustees on the Board, including the Secretary of State, the Mayor of the District of Columbia, the Speaker and Minority Leader of the House of Representatives, the Majority and Minority Leader of the Senate, and several other members of Congress. *Id.* § 76h(a)(2). Congress bestowed the Board with "all the usual powers and obligations of a trustee in respect of all trust funds administered by it." 20 U.S.C. § 76*l*(b). The Board is empowered to enter into contracts; prepare a budget; employ personnel; negotiate contracts; and manage the grounds of the Center. *See id.* § 76j(a)(2).

Congress directed the Board to maintain the Center as a living memorial to President Kennedy and to carry out various other duties. 20 U.S.C. § 76h(a)(1); *id.* § 76j. For example, the Board must "present classical and contemporary music, opera, drama, dance, and other performing arts," *id.* § 76j(a)(1)(A), and provide "facilities for other civic activities" and "a suitable memorial in honor of the late President," *id.* § 76j(a)(1)(D)-(E). It must also provide "all necessary maintenance, repair, and alteration of . . . the building and site, in a manner consistent with requirements for high quality operations." *Id.* § 76j(a)(1)(H)(ii). And it must "plan, design, and construct each capital repair, replacement, improvement, rehabilitation, alteration, or modification necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility." *Id.* § 76j(a)(1)(G).

**B. Factual and Procedural Background**

**1.** In December 2025, the Board voted to add Donald J. Trump's name to the Center in recognition of the President's continuing investment of time and effort to rebuild the Center as a premier, world-class performing arts facility. *See* JA46. Following the Board's vote, workers installed letters on the Center's front portico, such that it read, "The Donald J. Trump and the John F. Kennedy Memorial Center for the Performing Arts." JA47. The Center updated its

website to read "The Trump Kennedy Center" and began to send emails using that phrase. JA47.

Plaintiff Joyce Beatty, a member of the U.S. House of Representatives and an *ex officio* trustee of the Board by virtue of her position in Congress, filed suit. JA40. Plaintiff was not permitted to object to or vote on the Board's December decision. JA48.

In February 2026, President Trump announced that the Center would close for two years for construction, revitalization, and rebuilding. JA51. The Board planned to discuss and vote on the closure at its March 2026 meeting. JA56. At the meeting, Plaintiff noted her objection to closing the Center. JA276. After further discussion, the general trustees of the Board voted to close the Center for two years for renovation. *See* JA276-78.

Plaintiff filed an amended complaint challenging the Board's naming decision; the Board's amendment to its bylaws, which limited voting to general trustees; and the Board's decision to close for two years. JA60-69.

**2.** Plaintiff moved for partial summary judgment on the naming issue and a preliminary injunction preventing the closure of the Center.

The district court granted those motions in part. The court rejected Defendants' argument that Plaintiff lacked standing and concluded that Plaintiff was injured by virtue of her status as trustee. *See* JA313-26, 341. On the merits,

it granted summary judgment to Plaintiff on the naming issue, concluding that only Congress could modify the Center's name and that adding the President's name to the portico violated the statutory prohibition on additional "memorials." JA327-40. In addition, although Plaintiff had only sought preliminary relief on this issue, the court granted summary judgment to Plaintiff on the voting-rights issue, concluding that the organic statute gave *ex officio* trustees the same voting rights as general trustees. JA341-47. Finally, the court granted Plaintiff a preliminary injunction on the closure issue, concluding that while it would be lawful for the Board to close the Center temporarily, Plaintiff was likely to succeed in her claim that the Board had not adequately considered its closure decision. JA348-66.

The district court permanently enjoined the Center from "displaying, installing, or maintaining any physical or digital signage on the Kennedy Center building or grounds that designates, suggests, or implies that the institution is named for any person other than President John F. Kennedy, including but not limited to the signage that currently reads 'The Donald J. Trump And' on the front of the Center's main building . . . unless and until an Act of Congress so permits." JA280. It further enjoined the Center from "publishing, issuing, or distributing any official materials—including website content, email communications, promotional materials, press releases and statements,

contracts, and government filings—that refer to the institution as named for anyone other than John F. Kennedy, including but not limited to the 'Trump Kennedy Center,' or the 'Donald J. Trump and John F. Kennedy Memorial Center for the Performing Arts' unless and until an Act of Congress so permits." JA280.

The district court also permanently enjoined Defendants from "preventing *ex officio* trustees from voting on Board matters on which all general trustees are permitted to vote, unless and until an Act of Congress so permits." JA282.

Finally, the district court preliminarily enjoined Defendants from "effectuating the closure decision made at the March 16 Board meeting," but permitted the Center to "mov[e] forward with the capital repair work it has planned" and did not "prohibit the Board from closing the Center should it come to this decision anew after independently balancing its multiple obligations to the Center in a prudent fashion." JA286-87.

Defendants appealed the permanent injunctions, JA377, and the Court denied Defendants' motion for a stay pending appeal. Order, *Beatty v. Trump*, No. 26-5224 (D.C. Cir. July 8, 2026).

**3.** In June 2026, the Board met and unanimously agreed to recognize President Trump. JA394. When the Board met in August 2026, it passed a new resolution, which sought to recognize the President by inscribing "Renovated

and Restored by President Donald J. Trump" and "Endowed by the Trump Kennedy Center Fund" on the façade and by naming the Center's grounds "President Donald J. Trump Plaza." JA380. Plaintiff moved for emergency injunctive relief.

The court granted Plaintiff's motion in part, holding that both the "Renovated" inscription and the naming of the grounds violated the terms of its permanent injunction and the Center's organic statute. JA426. The court held that Plaintiff's challenge to the "Endowed" inscription, however, was premature. JA430. Because that inscription would only be made if the Trump Kennedy Center Fund's endowment reached $100 million, and because the Fund had not yet raised any money, there was no imminent risk of harm to justify a permanent injunction against the "Endowed" inscription. JA430. The court ordered Defendants to notify it in writing if the funding goal was reached and to provide 60 days' notice before making any such inscription. JA439-40. Defendants appealed this order as well. JA441.

## SUMMARY OF ARGUMENT

**I.** Plaintiff lacks standing to challenge the Board's naming decisions. Plaintiff's challenge to the naming decisions presents a quintessential generalized grievance, and Plaintiff's complaint is replete with the kinds of allegations that the Supreme Court has found insufficient to permit a plaintiff to

proceed in federal court—that is, purported wrongs that do not affect her in a personal and individual way.

Plaintiff's status as a trustee and fiduciary of the Center does not provide her with a personal interest in this dispute. Plaintiff does not allege that she might suffer individualized harm in the form of liability that the Board's actions might create for its trustees. Rightly so, as trust law releases a trustee in Plaintiff's position from liability for the actions at issue. Without any possible harm from potential future legal liability, all that remains is Plaintiff's general objection to the Board's actions. No harm "traditionally recognized" at common law provide a comparator to Plaintiff's generalized harms. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). And permitting Plaintiff to proceed here without having suffered a concrete and personalized harm would "infringe on the Executive Branch's Article II authority." *Id.* at 429.

Even though the district court (incorrectly) thought that the Center has violated its legal obligations, "courts may not exceed the bounds of their lawful authority simply because they may think another branch has exceeded its own." *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*, --- S. Ct. ----, 2026 WL 2564318, at *3 (2026). Plaintiff has discharged her fiduciary duties and has therefore discharged herself from any liability for the Board's actions. *See* D.C.

Code § 19-1307.03(f), (g). She does not possess a concrete stake in this lawsuit as a trustee.

**II.** On the merits, the district court erred in concluding that the Board's December 2025 and August 2026 resolutions ran afoul of the governing statutes. Because the Center's organic statute does not expressly preclude the Board from adopting a secondary name, the Board's decision to add President Trump's name was lawful. And the addition of President Trump's name did not constitute the designation of a "memorial," prohibited by Congress in 20 U.S.C. § 76j(b), because the recognition of the contributions of a living person is not a "memorial" as that term is ordinarily understood.

The Board's August 2026 resolution—which proposed to add an inscription on the front portico recognizing that the Center was "renovated and restored by President Donald J. Trump" and to rename the Center's grounds as the "President Donald J. Trump Plaza"—is similarly lawful. Congress did not name the Center's grounds or limit the Board's ability to do so. And neither the inscription nor the naming—both intended to recognize the President's current and future contributions—qualifies as a memorial. Also, because Plaintiff represented at the August Board meeting that she did not object to the naming of the Plaza, equity does not permit her to challenge that decision now.

**III.** The district court further erred in holding that the Center's organic statute entitled Plaintiff, an *ex officio* trustee, to exercise the same voting rights held by the appointed general trustees.

As the district court recognized, the statute itself says nothing about what rights different types of trustees must be permitted to exercise or which Board members may vote. It simply provides that the Board be composed of general trustees and *ex officio* trustees and that the "Board shall have all the usual powers and obligations of a trustee in respect of all trust funds administered by it." 20 U.S.C. § 76*l*(b). Here, the Board exercised its statutory discretion to make bylaws that "it deems necessary for the administration of its functions." *Id.* § 76*l*(a). Its decision to limit voting to general trustees was reasonable and reflected the Board's long-standing practice. *Ex officio* trustees, by the nature of their multiple roles, face significant burdens on their time and attention that justifies developing a different voting regime to govern their participation.

The district court disagreed, stating that disallowing *ex officio* Board members from voting did "not strike the Court as 'necessary.'" JA345. But that is a judgment left to the Board. And it is not unusual for different classes of trustees to have different rights to participate in a trust's administration and governance. The fact that *ex officio* members of some bodies can vote is of no moment, as the Board was within its authority provide otherwise in its bylaws.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed de novo, drawing all inferences from the evidence in favor of the non-movant. *Am. Soc'y for Testing and Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 445 (D.C. Cir. 2018). A district court's entry of a permanent injunction is reviewed for abuse of discretion, as a district court's enforcement of its own order. *United States v. Regenerative Scis.*, LLC, 741 F.3d 1314, 1318 (D.C. Cir. 2014); *Nix v. Billington*, 448 F.3d 411, 414 (D.C. Cir. 2006). "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

## ARGUMENT

### I. Plaintiff lacks standing to challenge the Board's naming decisions, because she raises only a generalized grievance.

**A.** Plaintiff lacks standing to challenge the Board's naming decisions, because those challenges raise only a generalized grievance. The "irreducible constitutional minimum of standing" requires a "concrete and particularized" injury to a legally protected interest, in addition to causation and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

An individual may not sue simply because they believe that the government is acting illegally or because "their legal objection is accompanied by" a strong personal objection to a government action. *Id.* That is because "[v]indicating 'the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive.'" *Id.* at 382 (quoting *Lujan*, 504 U.S. at 576).

Plaintiff's challenge to the naming decisions presents a quintessential generalized grievance. Indeed, Plaintiff has not alleged that she suffered any harm—whether "tangible," like a "physical" or "monetary" harm, or "intangible," like a reputational harm—stemming from the Board's naming decisions. *TransUnion*, 594 U.S. at 425. On the contrary, Plaintiff's complaint is replete with the kinds of allegations that the Supreme Court has found insufficient to permit a plaintiff to proceed in federal court—that is, purported wrongs that do not affect her "in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Instead, she alleges harm to other entities. *See, e.g.*, JA39 (renaming "is causing on-going severe harm to the Kennedy Center"); JA60 (Defendants are "harm[ing] the institution"). The fact that other people also disagree with the naming decision (JA49) only underscores the generalized nature of Plaintiff's grievance, as does the injunctive relief that Plaintiff sought

as to the renaming, which "no more directly and tangibly benefits [her] than it does the public at large." *Lujan*, 504 U.S. at 574.

Plaintiff's allegations thus do not satisfy her burden to show that she has been injured "in a 'personal and individual way.'" *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013). The harms she submits—financial, operational, and reputational harms—belong to someone else, *e.g.*, the Center itself and, by extension, the public. She has thus failed to establish that she has a "direct stake in the outcome" of her case. *Id.* (citation omitted).

**B.** Plaintiff argued, and the district court held, that Plaintiff's status as a trustee and fiduciary of the Center provided her with a personal interest in this dispute. *See* JA314-17. Those arguments are not correct.

Most significantly, Plaintiff does not allege that she might suffer individualized harm in the form of liability that the Board's actions might create for its trustees. And rightly so. Generally, trust law releases any trustee "who does not join in an action of another trustee" from liability "for the action." D.C. Code § 19-1307.03(f); *see also* Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, *Bogert's The Law of Trusts and Trustees* § 585 (May 2026 update) ("[A] co-trustee who does not join in taking an action concerning the trust ordinarily is not liable for any loss that occurs as a result of that action."). Indeed, the Restatement confirms that a "trustee is not liable for a breach of trust

committed by a co-trustee" unless the trustee acquiesced in the breach, was involved in concealing it, improperly delegated the trust's administration to the co-trustee, or enabled the co-trustee to commit the breach by failing to exercise reasonable care to prevent the breach. Restatement (Third) of Trusts § 81 cmt. e (A.L.I. Oct. 2024 update); *see* Restatement (Second) of Trusts § 224 (A.L.I. Oct. 2024 update) (stating the general rule and limited exceptions); D.C. Code § 19-1307.03(g) (requiring "reasonable care" to prevent breach or compel redress); Restatement (Third) of Trusts § 76 cmt. d (A.L.I. Oct. 2024 update) (providing examples of "reasonable steps").

None of the bases for liability apply here. Plaintiff noted her objection to the Board's decisions and opposed them in court. In these circumstances, she will not face any individual liability for the Board's decisions, no matter how the case concludes, and thus she lacked standing to see it through. *See Foretich v. United States*, 351 F.3d 1198, 1210 (D.C. Cir. 2003) ("A plaintiff must maintain standing throughout the course of litigation."). In other words, "[w]inning or losing this suit would not change" the fact that Plaintiff does not face liability for the Board's actions. *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020). And even if this Court thought that there was some hypothetical chance that a trustee in these circumstances could face liability, hypothetical harm does not vest a plaintiff with standing to seek injunctive relief. *See Clapper v. Amnesty Int'l USA*,

568 U.S. 398, 402 (2013) (harm must be "certainly impending"). Without any imminent harm from potential future legal liability, Plaintiff's only interest in this case is her general objection to the Board's actions. *See Hippocratic Med.*, 602 U.S. at 381.

Nor does any harm "traditionally recognized" at common law provide a comparator to Plaintiff's generalized harms. *TransUnion*, 594 U.S. at 425; *see Pileggi v. Washington Newspaper Publ'g Co.*, 146 F.4th 1219, 1226 (D.C. Cir. 2025). Breach of fiduciary duty does not fill this gap. That tort requires showing that the tortfeasor "stand[s] in a fiduciary relation" with the plaintiff and the harm results "from a breach of duty imposed by the relation." Restatement (Second) of Torts § 874 (A.L.I. Aug. 2026 update); *see also MobilizeGreen, Inc. v. Cmty. Found. for the Cap. Region*, 267 A.3d 1019, 1026 (D.C. 2022) (holding that "summary judgment is appropriate on a breach of fiduciary duty claim where . . . the defendant did not undertake a duty to act for the plaintiff's benefit").

Here, Plaintiff has suffered no harm from the renaming decisions to any interest she possesses by virtue of her position as a trustee. Any duties that the Center possesses are owed to its beneficiaries—the public. *See* 20 U.S.C. § 76j. And a generalized public interest cannot satisfy Article III. *Lujan*, 504 U.S. at 560 n.1. Indeed, the very fact that the public benefits from a charitable trust underscores why the traditional rule for enforcement of such trusts permits only

the "public," as represented by the sovereign, to vindicate that harm. *See Jackson v. Phillip*, 96 Mass. (14 Allen) 539, 579 (1867) (holding that it is "the duty of the king, as *parens patriœ*, to protect property devoted to charitable uses," noting that this duty is "executed by the officer who represents the crown for all forensic purposes," and clarifying that "[t]his duty of maintaining the rights of the public, and of a number of persons too indefinite to vindicate their own, has vested in the Commonwealth [of Massachusetts], and is exercised here, as in England, through the attorney general"); *Greene v. Art Inst. of Chi.*, 147 N.E.2d 415, 418 (Ill. App. Ct. 1957) (explaining that a plaintiff, as a member of the public, had no standing where his interests were represented by the state's attorney general).

**C.** Plaintiff has further argued, and the district court agreed (JA316-17) that traditionally, trustees may bring actions to compel co-trustees in common-law courts. But the enforcement of a *charitable* trust is a matter typically reserved to the sovereign. *See, e.g.*, *Bd. of Dirs., Wash. City Orphan Asylum v. Bd. of Trs., Wash. City Orphan Asylum*, 798 A.2d 1068, 1075 (D.C. 2002); *Mount Vernon Mortg. Corp. v. United States ex rel. Att'y Gen.*, 236 F.2d 724, 725 (D.C. Cir. 1956) (noting that only "the United States or the Attorney General" could sue to enforce the terms of a charitable trust organized in the District of Columbia). And whatever actions have historically been brought in state courts, Plaintiff fails to account for the independent Article III requirement that a lawsuit

brought in a federal court have a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425. Similarity to a cause of action—without a specified harm—is not enough to proceed in federal court. *See id.*

Permitting Plaintiff to proceed here without having suffered a concrete and personalized harm would "infringe on the Executive Branch's Article II authority." *Id.* at 429. The "choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *Id.* In other words, only the Executive Branch represents the American people in court, and Plaintiff accordingly cannot sue in a "representational capacity" to vindicate the public's interests. Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, *Bogert's The Law of Trusts and Trustees* § 585 (May 2026 update) (explaining that charitable trustees sue in a "representative capacity"). By foreclosing Plaintiff's attempt to litigate a generalized grievance, Article III preserves an "essential" element of the "separation of powers": that only the Executive is empowered to vindicate the public's interest in "general compliance" with the law. *Id.* And while the district court (incorrectly) thought that the Center has violated its legal obligations, "courts may not exceed the bounds of their lawful authority simply because they

may think another branch has exceeded its own." *Nat'l Tr. for Historic Pres. in the U.S.*, 2026 WL 2564318, at *3.

Plaintiff has discharged her fiduciary duty, and thus she has discharged herself from any liability for those actions. *See* D.C. Code § 19-1307.03(f), (g). She does not possess a concrete stake in this lawsuit as a trustee. And she has no concrete stake as an individual beyond the generalized interest she shares with every other citizen in compliance with the law. She will receive no benefit nor avoid any harm by obtaining a ruling in her favor on her construction and renaming claims. The judicial power—a power "limited" by Article III of the Constitution, *see Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025)—does not extend to claims like the ones Plaintiff raises.

The district court relied on *Sprint Communications Co. v. APCC Services*, 554 U.S. 269 (2008), and *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020), for the proposition that trustees have standing to enforce the terms of a trust and prevent or redress breach. *See* JA318-20. But those cases do not support Plaintiff. *Thole*'s dicta that "fiduciaries (including trustees who are fiduciaries) can sue other fiduciaries," 590 U.S. at 545, contemplates a situation where a trustee suffers a disproportionate financial harm from his trust's breach, such that he can invoke a right of contribution among defaulting fiduciaries. *See id.* (pointing out that a trustee could cause another financial harm by "using the plan's assets

as a 'personal piggybank'"). So too in *Sprint*, which held that a beneficiary's assignee "has standing to pursue the assignor's claims for money owed." 554 U.S. at 274. It did not suggest that a co-trustee has Article III standing to sue for every purported breach of the trust's terms. *Sprint*'s holding comports with *TransUnion*'s requirement to show a harm cognizable at common law—there, a financial harm. Plaintiff fails to do the same here.[1]

## II. The Board's decisions to recognize President Trump did not violate the Center's organic statute.

In 1964, Congress directed the Board of Trustees to construct "a building to be designated as the John F. Kennedy Center for the Performing Arts." 20 U.S.C. § 76i(a). This building was to "be the sole national memorial to the late John Fitzgerald Kennedy within the city of Washington and its environs." *Id.* § 76q. Two decades later, Congress directed the Board to ensure that, with three exceptions, "no additional memorials or plaques in the nature of memorials shall be designated or installed in the public areas of the John F. Kennedy Center for the Performing Arts." *Id.* § 76j(b)(1). The district court concluded that the

[1] With respect to a trustee of the Kennedy Center, any such harm must concern the "trust funds administered by" the Board. 20 U.S.C. § 76*l*(b). Some evidence exists suggesting that "trust funds" are "private donations and revenues from performances," ECF No. 45 at 3; *see also* 20 U.S.C. § 76k(a), but the district court concluded that the term refers to "all funds belonging to the Kennedy Center trust," JA312 (quotation omitted).

December 2025 and August 2026 resolutions contravened both provisions. The district court was wrong twice over.

**A.** In December 2025, the Board voted to add Donald J. Trump's name to the Center. JA46. This vote manifested itself in the installation of letters on the Center's front portico—which resulted in the signage reading "The Donald J. Trump and the John F. Kennedy Memorial Center for the Performing Arts"—and changes to the Center's website, among other things. JA47. All of this is fully in accord with Congress's codified commands.

The Board, in accord with its statutory duty, constructed a building "to be designated as the John F. Kennedy Center for the Performing Arts." 20 U.S.C. § 76i(a). And it maintained compliance with that directive even after the effectuation of the December resolution. The Board also ensured that the Center remained a "memorial" to President Kennedy. *Id.* § 76q; *see, e.g.*, JA47 (showing the retention of the statutorily mandated name on the building's facade). All of this is true because Congress did not include a statutory limitation on the Board's ability to add a secondary name. This absence is important, for without a preclusive statute, a trustee has "all of the powers over trust property that a legally competent, unmarried individual has with respect to individually owned

property." Restatement (Third) of Trusts § 85(1)(a) (A.L.I. Oct. 2024 update); *see also* 20 U.S.C. § 76*l*(b).[2]

This bundle of powers undoubtedly includes the ability to adopt a secondary name. Indeed, the use of secondary names to refer to all sorts of entities, including governmental ones, is quite common. The Department of Defense is also known as the Department of War in "official correspondence, public communications, ceremonial contexts, and non-statutory documents within the executive branch." Exec. Order No. 14347, 90 Fed. Reg. 43893, § 2(a) (Sep. 5, 2025).

And other agencies provide additional examples. Although "designated" as the "Harry S Truman Federal Building," Pub. L. No. 106-218, 114 Stat. 345 (2000), the State Department's headquarters is commonly referred to as "Foggy Bottom." The Federal National Mortgage Association, *see* 12 U.S.C. § 1716b, is commonly known—including on its website and in communications—as "Fannie Mae," a play on the pronunciation of its acronym. *See* Fannie Mae, Fannie Mae Announces Results of Tender Offer for Any and All of Certain CAS Notes (Mar. 2, 2026), https://perma.cc/9A8GLSG5. And the Consumer Financial Protection Bureau is statutorily designated as the "Bureau of

[2] In the light of this key tenet of trustee law, the district court erred in focusing on whether Congress "authorized" or "empower[ed]" the Board to add a secondary name. JA332-33. That reasoning flips the applicable presumption.

Consumer Financial Protection." 12 U.S.C. § 5491(a). But, since its inception, the Bureau has been known as the "Consumer Financial Protection Bureau," and its logo has reflected that alternate name. *E.g.*, Consumer Fin. Prot. Bureau, Financial Report of the Consumer Financial Protection Bureau at 1 (2011), https://perma.cc/Q64LQNCK.

No one, to Appellants' knowledge, has suggested that these references violate the law. And there is no persuasive reason to distinguish this case from those. The district court tried to offer one—namely that this case "implicate[s] a presidential memorial that was legislatively intended to honor a specific public figure." JA334. But the State Department example refutes that reasoning. And, in any case, whether they implicate a former President or not, the above examples serve to demonstrate that, before now, naming provisions were not read to be exclusive, nor were those using secondary names understood to be violating the law. That point holds regardless of the legislative intent behind a specific naming decision.

The district court also reasoned that this case is different because it is a "renaming" rather than the addition of a "secondary name" or an "innocuous nicknaming." JA334. This analysis also fails to survive scrutiny. Regardless of the label used to describe the Board's vote, the statutory text is not exclusive, just as the other provisions detailed above are not. And, importantly, as

Congress has required, the Center remained a "national memorial to the late John Fitzgerald Kennedy." 20 U.S.C. § 76q.

To be sure, elsewhere in the Center's organic statute, Congress did forbid, with some exceptions, the Board from designating or installing "in the public areas" of the Center any "additional memorials or plaques in the nature of memorials." 20 U.S.C. § 76j(b)(1). But the lettering that was on the building's façade did not constitute a "memorial" or a plaque "in the nature of" a memorial. Start with the text of the lettering itself. The word "memorial" appeared only once on the facade: immediately after *President Kennedy's* name. The text including *President Trump's* name did not indicate that the text was intended to memorialize him.

The text of the statute cuts in the same direction. A "memorial" is "anything meant to help people remember some person or event, as a statue" or a "holiday." *Memorial*, Webster's New Universal Unabridged Dictionary (2d ed. 1983). A "memory" typically "denotes the power by which we reproduce past impressions," akin to a "distinct effort to collect again or call back what we know has been formerly in the mind," often as a "posthumous" "remembrance." *Id.* Congress's use of the term "memorial" confirms that it intended to sweep in only those adornments meant to "help remember" some "past impression." And its preclusion of plaques "in the nature of memorials," is intended to cover

no more than plaques "classifiable as" memorials. *Of/In the Nature of*, def. 4a, Oxford English Dictionary (rev. ed 2003). An addition that acknowledges the involvement and leadership of the sitting President of the United States simply does not qualify as sign proscribed by this provision.

The district court disagreed, reading the addition as contrary to "the terms of Congress's clear proscription." JA335. But the district court failed to pay careful attention to those terms. If Congress truly meant for a proscription as broad as the district court envisioned, then Congress would have used different language. Instead of banning memorials or plaques in the nature of a memorial, Congress could have banned, for example, all "acknowledgements"—a term used elsewhere in the statutory scheme. *See* 20 U.S.C. § 76i(c)(3). Or Congress could have banned all additions of plaques or text in the public areas of the Center.

But it did not. And Congress's choice in text, given the other terms used elsewhere in the statutory scheme, matters. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022); *Russello v. United States*, 464 U.S. 16, 23 (1983). Congress limited its prohibition to memorials and did so as part of a bill that otherwise used the term "memorial" to refer to posthumous recognitions. *See* Pub. L. No. 98-205, 97 Stat. 1387, 1387 (1983) (both authorizing the construction of a "memorial" to commemorate "the life and accomplishments of Juliette Gordon

Low" over a half-century after her passing and enacting the restriction in § 76j(b)(1)). Rather than mere "legislative history," JA336, this context suggests that, at the time Congress enacted 20 U.S.C. § 76j(b)(1), it understood that provision's use of the word "memorial" to have a similar sweep, *see Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) ("[I]t's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning at the time Congress enacted the statute." (citation modified)).

The district court also relied on statements from Karoline Leavitt, the then-Press Secretary, and Roma Daravi, then the Center's Vice President of Public Relations, as evidence that the Board's vote intended to honor the President's "past work," making the signage a memorial. JA335-36 (quotation omitted). Even assuming that it is possible to memorialize a living person, *but cf. supra* at 27-29, these statements are quite the slender reed on which to rest a permanent injunction. Neither Leavitt nor Daravi spoke for the Board, and neither cited statement provides much, if any, insight into the intent behind the Board's vote. And, given that the President's work to revitalize the Center was nowhere near over when the Board voted last December, there is every reason to think the Board wanted to recognize the President for his continued contributions, not only those in the past. *Cf.* JA380-81. The signage therefore

"ensure[d]" (JA336) that visitors were aware of these contributions. The district court erred in concluding that, on these facts, the signage constituted a memorial or plaque in the nature of a memorial.

**B.** At a meeting in June, after appealing the district court's May order, the Board unanimously agreed to find a way to recognize President Trump. JA390-94. Then, in August, the Board voted to recognize the contributions of President Trump in three other ways. First, "to honor the President's contributions, current and future," the Board voted to place an inscription on the front of the building, stating "renovated and restored by President Donald J. Trump." JA380. Second, to "further recognize the President's contributions, current and future," the Board voted to add "endowed by The Trump Kennedy Center Fund" under the first inscription once the Fund's endowment reaches at least $100 million. JA380. And third, the Center voted "to name the physical site and grounds upon which the Center sits" the "President Donald J. Trump Plaza." JA380. All three of these recognitions comply with the Center's organic statute, even as interpreted by the district court's May order. But the district court still enjoined effectuation of the first (the "Renovation Inscription") and the third (the "Grounds Naming").[3] This again was error.

[3] As discussed, the district court agreed with Defendants that Plaintiff's challenge to the second recognition was unripe. *See* JA430.

Start with the first way. The planned inscription—"renovated and restored by President Donald J. Trump"—does not constitute a renaming of the Center. And it does not constitute a memorial or plaque in the nature thereof either. As explained above, the district court misinterpreted 20 U.S.C. § 76j(b)(1) in its May order. But even if the district court correctly interpreted this prohibition in its May order, this first proposal is clearly lawful. Unlike in December, the Board made clear in August that it desired to recognize the President's "current and future" contributions to the Center. JA380. Given that the renovation and restoration is to come, the Board's vote clearly was not intended to honor the President's "past work." JA336. And because the planned inscription is meant to recognize the present and future, rather than to "help people remember some person or event," it does not qualify as a memorial. *Memorial*, Webster's New Universal Unabridged Dictionary (2d ed. 1983).

In response, the district court labeled the above argument as a "word game[]." JA428. Instead, Defendants are providing a "careful examination of the statutory text," *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 83 (2017), and applying the "ordinary meaning" of the term in focus, *Wis. Cent. Ltd.*, 585 U.S. at 277. And that ordinary meaning confirms that the district court misinterpreted the provision in enjoining the implementation of the Renovation Inscription.

The district court also believed that the Renovation Inscription would be a "memorial" because it "uses the past participles 'renovated' and 'restored.'" JA428. But the Board was clear that the Inscription meant to recognize President Trump for his "current and future" contributions, JA380, and even if the Inscription, one day in the future, serves exclusively a backward-looking function, that is not a reason to enjoin effectuation of the Board's resolution at present, *see Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010) ("[A] permanent injunction is not now needed to guard against any present or imminent risk of likely irreparable harm."). All that matters for the present is that the Inscription does not constitute a "memorial," and thus the district court should not have entered a permanent injunction.

The district court also erred in enjoining effectuation of the part of the August resolution that proposes to "name the physical site and grounds upon which the Center sits . . . the 'President Donald J. Trump Plaza.'" JA380.

To start, at the August board meeting, Plaintiff made clear that she did not object "to the naming of the plaza." JA412. Equity precludes her from "encourag[ing] [this] act to be done," and then, mere days later, suing the Board for agreeing. *See O'Brien v. Weld*, 92 U.S. 81, 84-85 (1875) ("A party cannot even encourage an act to be done, and then exercise a legal right in hostility to such

act, to the injury of the party obeying his intimations."); *cf. Bartko v. Sec. & Exch. Comm'n*, 845 F.3d 1217, 1227 (D.C. Cir. 2017).

For two reasons, the district court concluded otherwise. First, the district court interpreted the meeting minutes to "make clear" that Plaintiff "did have concerns about the Grounds Renaming." JA432. Not so. Instead, Plaintiff asked about the resolution's compliance with the statute and then made clear that, with respect to a specific piece—the naming of the Plaza—she had no objection. JA412. She never opined that the naming of the Plaza violated the Center's organic statute. Instead, she merely opined that, as a general matter, the resolution "may not be in compliance." JA413. Taking all this together, the best reading of Plaintiff's comments is that, while she does not oppose the naming of the Plaza, she did not find at least one of the other parts of the resolution lawful, and thus voted no. The district court's contrary interpretation fails to account for this context.

Second, the district court concluded that Plaintiff's "imprecise comments" did not defeat her standing. JA432. For support, the district court relied on a provision of the Restatement that provides, "because the suit is on behalf of the trust and its beneficiaries," a "trustee is not precluded from maintaining a suit for redress by the fact that the trustee participated in the breach of trust." Restatement (Third) of Trusts § 81 cmt. d (A.L.I. Oct. 2024 update). But this

provision does not justify the displacement of basic principles of equity, which foreclose Plaintiff's maneuvering here. The district court also relied on *Salazar v. Buono*, 559 U.S. 700 (2010), for the proposition that Plaintiff has Article III standing to ensure compliance with the May injunction. *See* JA432. But even if Plaintiff had Article III standing, that does not excuse her from the equitable principles discussed above. *Cf. Reuss v. Balles*, 584 F.2d 461, 465 n.14 (D.C. Cir. 1978) ("[I]f the court believes that the plaintiff has standing . . . , it may, nonetheless, because of the unusual circumstances of the case, dismiss for want of equity."). For these reasons, the district court erred in concluding that Plaintiff could seek emergency injunctive relief only days after agreeing with most of the Board about the propriety of renaming the Plaza.

Even if the district court was right to reach the merits, it was wrong in its analysis of them. Congress has not named the physical site and grounds of the Center, nor has Congress expressly forbidden the Board from selecting a name. Instead, statute after statute makes clear that Congress's designation applies only to the Center's building. Congress directed the Board "to maintain and administer the John F. Kennedy Center for the Performing Arts and *site thereof* as the National Center for the Performing Arts." 20 U.S.C. § 76h(a)(1) (emphasis added). Congress also ordered the Board to construct "a building to be designated as the John F. Kennedy Center for the Performing Arts on *a site*

*in the District of Columbia*." 20 U.S.C. § 76i(a) (emphasis added). And Congress made clear that the Board oversaw not only the building but also had the duty of "manag[ing] and operat[ing] the grounds of the John F. Kennedy Center for the Performing Arts." 20 U.S.C. § 76j(a)(2)(F).

Each of these statutes draw a distinction between the building—designated by Congress as the John F. Kennedy Center for the Performing Arts—and the site or grounds, which Congress did not name. Before now, this distinction was unquestioned. Indeed, the Board previously named various parts of the Center's campus, including the REACH. That decision does not conflict with the Center's organic statute, and this one does not either.

In response to these arguments below, the district court concluded that the naming of the Plaza constituted a memorial to President Trump and thus barred under 20 U.S.C. § 76j(b). *See* JA433. But § 76j(b) is no impediment. For one, the Board did not direct the Center to effectuate the resolution in any way, and the resolution alone is not itself a memorial or plaque in the nature of a memorial. In any case, the Grounds Naming, like the Renovation Inscription, is meant to recognize the President's ongoing efforts, not to remember past impressions, *see* JA380; *supra* at 31, and thus does not constitute a memorial.

The district court also concluded that, despite the above statutes, the best reading of the statutory scheme is that Congress named both the building and

the grounds. *See* JA434-35. For evidence, the district court cited some statutes that it believed referred to the Center as the "entire campus." JA434. As an example, Congress, in 2012, provided that the Board's acknowledgement of private contributions used in carrying out the REACH project must "be consistent with the requirements of section 76j(b) of this title." 20 U.S.C. § 76i(3). The district court took this to mean that the reference to "the John F. Kennedy Center for the Performing Arts" in § 76j(b) includes the campus. *See* JA434. Instead, the fact that Congress felt the need to enumerate that the same set of requirements applies indicates that, otherwise, they would not, because § 76j(b) applies only to the building. At the least, this reference does not supply the clear statutory prohibition necessary to support the injunction.

The district court also relied on the anti-redundancy canon, citing statutes that rely to the "building" of the "John F. Kennedy Center for the Performing Arts." JA435; *see, e.g.*, 20 U.S.C. §§ 76i(4), 76j(a)(1)(H)(ii), 76q-1(a)(4), 76s. But the district court "overstate[d] the significance of statutory surplusage or redundancy," which "is not a silver bullet" in statutory interpretation. *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019). Indeed, "redundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication."

*Barton v. Barr*, 590 U.S. 222, 239 (2020). Therefore, this redundancy does not supply the clear constraint on the Board's authority that Plaintiff needs.

The district court next suggested that Defendants' interpretation must be incorrect, because the Board "would lack authority to take any actions with respect to the grounds." JA435. That does not follow. The Board's purview is defined by Congress, and Congress made clear that the Board has authority over the Center's grounds. *See, e.g.*, 20 U.S.C. § 76j(a)(2)(F). This authority does not hinge on whether Congress has named the grounds after President Kennedy.

The district court then cited statements of the Board, from Secretary Lutnick, and in Defendants' briefing that the district court took as agreement that the Center is more than a building. JA435. But the cited quotations do not substitute for a statutory restriction on the Board's ability to name the grounds. Only such a restriction can save the district court's injunction, *see* Restatement (Third) of Trusts § 85(1)(a) (A.L.I. Oct. 2024 update), and there is not one. Instead, Congress "designated" a building and left the rest to the Board's discretion. 20 U.S.C. § 76i(a).

The district court ended its analysis with a recourse to congressional intent. JA435-36. But "the most important manifestation of Congressional intent" is the "language of the statute." *Pub. Citizen, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 332 F.3d 654, 662 (D.C. Cir. 2003) (quotation omitted). And for

the reasons above, the Board complied with that language in naming the Plaza after President Trump. The district court erred in holding otherwise.

### III. The Board's bylaw amendment that clarified *ex officio* trustees' nonvoting status did not violate the Center's organic statute.

**A.** The district court further erred in holding that the statute entitled Plaintiff, an *ex officio* trustee, to exercise the same voting rights held by the appointed general trustees. As the court recognized, the statute itself says nothing about what rights different types of trustees must be permitted to exercise. Indeed, the Board's long-standing custom is that *ex officio* trustees do not vote and do not count toward a quorum of voting members. *See* JA145.

Beyond that, Congress has authorized the Board to make "bylaws, rules, and regulations, as it deems necessary for the administration of its functions under this subchapter, including, among other matters, bylaws, rules, and regulations relating to the administration of its trust funds and the organization and procedure of the Board." 20 U.S.C. § 76*l*(a). Last year, the Board exercised this authority to amend its bylaws to reflect its long-standing custom that *ex officio* trustees do not vote on Board matters. JA45, 145. That amendment was within the Board's authority and did not violate the Center's organic statute.

The statute does not establish specific voting rights for trustees, as the district court recognized. JA343 ("[T]he statute says nothing explicit about which members may or may not vote."). It simply provides that the Board "be

composed of" general trustees and *ex officio* trustees, 20 U.S.C. § 76h(a)(2), and that the "Board shall have all the usual powers and obligations of a trustee in respect of all trust funds administered by it," *id.* § 76*l*(b). Here, the Board exercised its statutory discretion to make bylaws that "it deems necessary for the administration of its functions." *Id.* § 76*l*(a). And its decision to limit voting to general trustees was reasonable. *Ex officio* trustees, by the nature of their multiple roles, face significant burdens on their time and attention that might justify developing a different voting regime to govern their participation. *See* JA271-72 (reflecting that the vast majority of *ex officio* trustees were absent for the March Board meeting).

**B.** The district court acknowledged that "the statute says nothing explicit about which members may or may not vote." JA343. But the district court proceeded to opine that prohibiting *ex officio* members from voting did "not strike the Court as 'necessary.'" JA345. That is a judgment left to the Board, however. *See* 20 U.S.C. § 76*l*(a) (Board to make bylaws that "it deems necessary"). Nor does it follow from the fact that the Board has "all the usual powers and obligations of a trustee in respect of" the trust funds, *id.* § 76*l*(b); JA343-44, that *ex officio* trustees must always be permitted to vote.

The district court also cited Black's Law Dictionary for the proposition that "an ex officio member is a voting member unless the applicable governing

document provides otherwise." JA343-44. But here, the applicable governing document—the Center's amended bylaws—does provide otherwise. *See* Document (governing document), *Black's Law Dictionary* (12th ed. 2024) (including bylaws as an example of "governing documents"). And it is not unusual for different classes of trustees to have different rights to participate in a trust's administration and governance. *See, e.g.*, *Steeneck v. Univ. of Bridgeport*, 668 A.2d 688, 690 (Conn. 1995) (describing different classes of trustees in bylaws for a state-chartered university, including non-voting honorary trustees); D.C. Code § 29-401.02(8) (recognizing that the board of a nonprofit organization may vest "by" its "bylaws" a "[d]esignated body" with powers otherwise "exercised by the board or the members").

In district court, Plaintiff identified various statutes governing federally chartered trusts in which Congress did differentiate between voting and non-voting members. *See* PI Motion, ECF No. 13-1, at 19-22 (collecting statutes); *see also, e.g.*, 7 U.S.C. § 1627b(f)(3)(A) (including on the board of the National Sheep Industry Improvement Center "7 voting members"); 22 U.S.C. § 7302(b)(2)(A) (establishing a Diplomatic Telecommunications Service Governance Board with five "voting members"); 47 U.S.C. § 1423(b)(1)(A) (establishing a Public Safety Interoperability Board with fourteen "voting members"); 28 U.S.C. § 991(a) (establishing the Sentencing Commission,

consisting of "seven voting members and one nonvoting member"); 46 U.S.C. § 51312(b)(1)(F)(vi) (establishing that *ex officio* members of the Board of Visitors of the Merchant Marine Academy appointed under subparagraphs (B) or (D) are "voting member[s] of the Board"). Plaintiff argued that these statutes imply that Congress intended for all of the Center's trustees to have full voting rights. *See* PI Motion, ECF No. 13-1, at 22. On the contrary, they suggest that Congress knows how to impose restrictions on a trust's ability to manage its affairs and chose not to impose similar restrictions here. The district court erred in holding otherwise.

## IV. The equities do not support the permanent injunctions as to the December 2025 and August 2026 resolutions.

When faced with a motion for injunctive relief, a court must first determine whether the movant faces "any present or imminent risk of likely irreparable harm." *Monsanto*, 561 U.S. at 162. The court must then weigh the equities to evaluate whether an injunctive remedy is an appropriate exercise of remedial discretion. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (explaining that a court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" before issuing an injunction, which is "an extraordinary remedy never awarded as of right"). These factors do not support the entry of injunctive relief.

Below, the district court concluded that Plaintiff's "inability to administer the trust in accordance with its governing statute is an irreparable injury that the Court cannot fix by awarding money damages or remedies available at law." JA339. But Plaintiff's abstract inability to fulfill her statutory duties does not qualify as an injury that is "both certain and great." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). And, in any case, any harm Plaintiff will suffer in her capacity as a trustee is merely a "harm" to the Center's ability to fulfill its mission. That "harm," as the Board's statutes make clear, is not to Plaintiff—it is to the public, as beneficiaries of the trust. Plaintiff's asserted harm is, at best, the harm any trustee—or, for that matter, any corporate director, legislator, or voter—faces when the democratic body in which she participates takes an action with which she disagrees. That harm is not cognizable in federal court. *Cf. L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1199, 1201–02 (9th Cir. 1980) (finding no irreparable injury where three-fourths quorum of owners needed to approve team transfers and plaintiff alleged it would lose such a vote); *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018) ("[I]njuries to third parties are not a basis to find irreparable harm.").

Indeed, *Dellinger v. Bessent*, a case Plaintiff relied on below, confirms that any harm resulting from being unable to fulfill a "statutory mission" belongs to the person—or entity—directly charged with fulfilling that mission. 766 F.

Supp. 3d 57, 70 (D.D.C. 2025) (citing 5 U.S.C. § 1212, establishing the Special Counsel role). Here, the Board is the "trustee in respect of all trust funds administered by it," 20 U.S.C. § 76*l*(b), responsible for fulfilling the duties established under the Center's governing statutes, *id.* § 76j(a)(1). Plaintiff is a member of the Board, but she is not the Board. Any harm from an inability to fulfill the statutory mission in the Center's charter belongs not to Plaintiff as an individual. It belongs to the Board itself. A trustee might well believe that any action taken against her wishes means that statutory obligations are being impeded. But only the body charged with undertaking those obligations has the right to assert that harm. *See Dellinger*, 766 F. Supp. 3d at 70.

Plaintiff's alleged harms pale in comparison to the real harms on the other side of the ledger. For one, the absence of a recognition to President Trump threatens to impede the Center's fundraising efforts and contribute to the financial decline of the Center. As the Center's Executive Director explained, the President has been a central force in the Center's current fundraising efforts, but his supporters will be deterred from contributing to the Center if his name is removed. *See* ECF No. 47-1 at 2. This loss of fundraising time and potential is also definitionally irreparable, and the public interest weighs in favor of an economically viable Center. Again, the district court erred in concluding

otherwise, JA340, and in rejecting the financial projections of the Center's Executive Director on this issue.

There is also the real harm to the Board caused by the judicial intrusion on its discretionary authority, which is counter to well-understood principles of judicial review in this context. *See Shelton v. King*, 229 U.S. 90, 94-95 (1913); *cf. Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025).

The equities and balance of harms strongly favor reversal.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court and vacate the permanent injunctions.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

/s/ Brantley T. Mayers
BRANTLEY T. MAYERS
*Attorney*
*Civil Division, Room 3338*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530*
*(202) 890-9874*
*brantley.t.mayers@usdoj.gov*

SEPTEMBER 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,157 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.

*/s/ Brantley T. Mayers*
Brantley T. Mayers

# ADDENDUM

# TABLE OF CONTENTS

20 U.S.C. § 76h ........ A1

20 U.S.C. § 76i ........ A3

20 U.S.C. § 76j ........ A5

20 U.S.C. § 76k ........ A9

20 U.S.C. § 76l ........ A12

20 U.S.C. § 76q ........ A13

**20 U.S.C. § 76h**

**§ 76h. Board of Trustees**

(a) Establishment

(1) In general

There is established in the Smithsonian Institution a bureau, which shall be directed by a board to be known as the Trustees of the John F. Kennedy Center for the Performing Arts (hereafter in this subchapter referred to as the "Board"), whose duty it shall be to maintain and administer the John F. Kennedy Center for the Performing Arts and site thereof as the National Center for the Performing Arts, a living memorial to John Fitzgerald Kennedy, and to execute such other functions as are vested in the Board by this subchapter.

(2) Membership

The Board shall be composed of—

(A) the Secretary of Health and Human Services;

(B) the Librarian of Congress;

(C) the Secretary of State;

(D) the Chairman of the Commission of Fine Arts;

(E) the Mayor of the District of Columbia;

(F) the Superintendent of Schools of the District of Columbia;

(G) the Director of the National Park Service;

(H) the Secretary of Education;

(I) the Secretary of the Smithsonian Institution;

(J)

(i) the Speaker and the Minority Leader of the House of Representatives;

(ii) the chairman and ranking minority member of the Committee on Transportation and Infrastructure of the House of Representatives; and

(iii) three additional Members of the House of Representatives appointed by the Speaker of the House of Representatives;

(K)

(i) the Majority Leader and the Minority Leader of the Senate;

(ii) the chairman and ranking minority member of the Committee on Environment and Public Works of the Senate; and

(iii) three additional Members of the Senate appointed by the President of the Senate; and

(L) thirty-six general trustees, who shall be citizens of the United States, to be appointed in accordance with subsection (b).

(b) General trustees

The general trustees shall be appointed by the President of the United States. Each trustee shall hold office as a member of the Board for a term of 6 years, except that—

(1) any member appointed to fill a vacancy occurring before the expiration of the term for which the predecessor of the member was appointed shall be appointed for the remainder of the term;

(2) a member shall continue to serve until the successor of the member has been appointed; and

(3) the term of office of a member appointed before July 21, 1994, shall expire as designated at the time of appointment.

(c) Advisory Committee on the Arts

There shall be an Advisory Committee on the Arts composed of such members as the President of the United States may designate, to serve at the pleasure of the President. Persons appointed to the Advisory Committee on the Arts, including officers or employees of the United States, shall be persons who are recognized for their knowledge of, or experience or interest in, one or more of the arts in the fields covered by the John F. Kennedy Center for the Performing Arts. The President shall designate the Chairman of the Advisory Committee on the Arts. In making such appointments the President shall give consideration to such recommendations as may from time to time be submitted to him by leading national organizations in the appropriate art fields. The Advisory Committee on the Arts shall advise and consult with the Board and make recommendations to the Board regarding existing and prospective cultural activities to be carried out by the John F. Kennedy Center for the Performing Arts. The Advisory Committee on the Arts shall assist the Board in carrying out

section 76k(a) of this title. Members of the Advisory Committee on the Arts shall serve without compensation.

**20 U.S.C. § 76i**

**§ 76i. John F. Kennedy Center for the Performing Arts.**

(a) In general

The Board shall construct for the Smithsonian Institution, with funds raised by voluntary contributions, a building to be designated as the John F. Kennedy Center for the Performing Arts on a site in the District of Columbia bounded by the Inner Loop Freeway on the east, the Theodore Roosevelt Bridge approaches on the south, Rock Creek Parkway on the west, New Hampshire Avenue and F Street on the north, which shall be selected for such purpose by the National Capital Planning Commission. The National Capital Planning Commission shall acquire by purchase, condemnation, or otherwise, lands necessary to provide for the John F. Kennedy Center for the Performing Arts and related facilities. Such building shall be in accordance with plans and specifications approved by the Commission of Fine Arts.

(b) Parking garage additions and site improvements

(1) In general

Substantially in accordance with the plan entitled "Site Master Plan--Drawing Number 1997-2 April 29, 1997," and map number NCR 844/82571, the Board may design and construct--

(A) an addition to the parking garage at each of the north and south ends of the John F. Kennedy Center for the Performing Arts; and

(B) site improvements and modifications.

(2) Availability

The plan shall be on file and available for public inspection in the office of the Secretary of the Center.

(3) Limitation on use of appropriated funds

No appropriated funds may be used to pay the costs (including the repayment of obligations incurred to finance costs) of--

(A) the design and construction of an addition to the parking garage authorized under paragraph (1)(A);

(B) the design and construction of site improvements and modifications authorized under paragraph (1)(B) that the Board specifically designates will be financed using sources other than appropriated funds; or

(C) any project to acquire large screen format equipment for an interpretive theater, or to produce an interpretive film, that the Board specifically designates will be financed using sources other than appropriated funds.

(c) Expansion project

(1) Authority to construct

(A) In general

Subject to the requirements of this subsection, the Board may undertake such activities as may be necessary to construct the expansion project.

(B) Responsibilities of the Board

The Board may construct the expansion project, and shall be responsible for the planning, design, engineering, and construction of the expansion project.

(C) Limitations

(i) Mission

All activities carried out under this paragraph shall be within the mission of the John F. Kennedy Center for the Performing Arts to serve as the national center for the performing arts.

(ii) Funding

The costs of planning, design, engineering, and construction of the expansion project shall be paid for using nonappropriated funds.

(2) Annual operations and maintenance costs

(A) Estimates

Before awarding a contract for construction of the expansion project, the Board shall estimate any additional annual operations and maintenance costs (or savings) associated with the project.

(B) Budget requests

The Board shall account for any additional costs identified under subparagraph (A) in making a budget request for fiscal year 2014 and each fiscal year thereafter.

(C) Budget priorities

The Board shall base a final determination on whether to proceed with the expansion project on the ability of the Board to accommodate any additional costs identified under subparagraph (A) within the other budget priorities of the Board.

(3) Acknowledgments

The Board may acknowledge private contributions used in carrying out the expansion project in the interior of the project, but may not acknowledge such private contributions on the exterior of the project. Any acknowledgment of private contributions under this paragraph shall be consistent with the requirements of section 76j(b) of this title.

(4) Expansion project defined

In this subsection, the term "expansion project" means an addition to the south end of the building of the John F. Kennedy Center for the Performing Arts that--

(A) is less than 100,000 square feet;

(B) will improve the existing (as of June 8, 2012) accessibility and education functions of the Center; and

(C) will become part of the existing (as of June 8, 2012) structure of the Center.

**20 U.S.C. § 76j**

**§ 76j. Duties of Board**

(a) Programs, activities, and goals

(1) In general

The Board shall—

(A) present classical and contemporary music, opera, drama, dance, and other performing arts from the United States and other countries;

(B) promote and maintain the John F. Kennedy Center for the Performing Arts as the National Center for the Performing Arts—

(i) by developing and maintaining a leadership role in national performing arts education policy and programs, including developing and presenting original and innovative performing arts and educational programs for children, youth, families, adults, and educators designed specifically to foster an appreciation and understanding of the performing arts;

(ii) by developing and maintaining a comprehensive and broad program for national and community outreach, including establishing model programs for adaptation by other presenting and educational institutions; and

(iii) by conducting joint initiatives with the national education and outreach programs of the Very Special Arts, an entity affiliated with the John F. Kennedy Center for the Performing Arts which has an established program for the identification, development, and implementation of model programs and projects in the arts for disabled individuals;

(C) strive to ensure that the education and outreach programs and policies of the John F. Kennedy Center for the Performing Arts meet the highest level of excellence and reflect the cultural diversity of the United States;

(D) provide facilities for other civic activities at the John F. Kennedy Center for the Performing Arts;

(E) provide within the John F. Kennedy Center for the Performing Arts a suitable memorial in honor of the late President;

(F) develop, and update annually, a comprehensive building needs plan for the features of the John F. Kennedy Center for the Performing Arts in existence on July 21, 1994;

(G) with respect to the building and site of the John F. Kennedy Center for the Performing Arts, plan, design, and construct each capital repair, replacement, improvement, rehabilitation, alteration, or modification necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility;

(H) provide—

(i) information and interpretation; and

(ii) with respect to the building and site of the John F. Kennedy Center for the Performing Arts, all necessary maintenance, repair, and alteration of, and all janitorial, security, and other services and equipment necessary for the operations of, the building and site, in a manner consistent with requirements for high quality operations; and

(I) ensure that safe and convenient access to the site of the John F. Kennedy Center for the Performing Arts is provided for pedestrians and vehicles.

(2) Administrative powers and duties

(A) Authority to enter into contracts

The Board, in accordance with applicable law, may enter into contracts or other arrangements with, and make payments to, public agencies or private organizations or other private persons in order to carry out the functions of the Board under this subchapter. The authority described in the preceding sentence includes utilizing the services and facilities of other agencies, including the Department of the Interior, the General Services Administration, and the Smithsonian Institution.

(B) Preparation of budget

The Board shall prepare a budget pursuant to sections 1104, 1105(a), and 1513(b) of title 31.

(C) Use of agency personnel

The Board may utilize or employ the services of the personnel of any agency or instrumentality of the Federal Government or the District of Columbia, with the consent of the agency or the instrumentality concerned, on a reimbursable basis, and utilize voluntary and uncompensated personnel.

(D) Selection of contractors

In carrying out the duties of the Board under this subchapter, the Board may negotiate any contract—

(i) for planning, design, engineering, or construction of buildings to be erected on the John F. Kennedy Center Plaza under section 76q–

1 of this title and for landscaping and other improvements to the Plaza; or

(ii) for an environmental system for, a protection system for, or a repair to, maintenance of, or restoration of the John F. Kennedy Center for the Performing Arts,

with selected contractors and award the contract on the basis of contractor qualifications as well as price.

(E) Maintenance of halls

The Board shall maintain the Hall of Nations, the Hall of States, and the Grand Foyer of the John F. Kennedy Center for the Performing Arts in a manner that is suitable to a national performing arts center that is operated as a Presidential memorial and in a manner consistent with other national Presidential memorials.

(F) Maintenance of grounds

The Board shall manage and operate the grounds of the John F. Kennedy Center for the Performing Arts in a manner consistent with National Park Service regulations and agreements in effect on July 21, 1994. No change in the management and operation of the grounds may be made without the express approval of Congress and of the Secretary of the Interior.

(b) Restriction on additional memorials

(1) Except as provided in paragraph (2) of this subsection, the Board shall assure that after December 2, 1983, no additional memorials or plaques in the nature of memorials shall be designated or installed in the public areas of the John F. Kennedy Center for the Performing Arts.

(2) Paragraph (1) of this subsection shall not apply to—

(A) any plaque acknowledging a gift from a foreign country;

(B) any plaque on a theater chair or a theater box acknowledging the gift of such chair or box; and

(C) any inscription on the marble walls in the north or south galleries, the Hall of States, or the Hall of Nations acknowledging a major contribution;

which plaque or inscription is permitted under policies of the Board in effect on December 2, 1983.

(3) For purposes of this subsection, testimonials and benefit performances shall not be construed to be memorials.

**20 U.S.C. § 76k**

**§ 76k. Powers of Board**

(a) Solicitation and acceptance of gifts

The Board is authorized to solicit and accept for the John F. Kennedy Center for the Performing Arts, as a bureau of the Smithsonian Institution, and to hold and administer gifts, bequests, or devises of money, securities, or other property of whatsoever character for the benefit of the John F. Kennedy Center for the Performing Arts. Unless otherwise restricted by the terms of the gift, bequest, or devise, the Board is authorized to sell or exchange and to invest or reinvest in such investments as it may determine from time to time the moneys, securities, or other property composing trust funds given, bequeathed, or devised to or for the benefit of the John F. Kennedy Center for the Performing Arts. The income as and when collected shall be placed in such depositaries as the Board shall determine and shall be subject to expenditure by the Board.

(b) Appointment of officers and employees

(1) Chairperson and Secretary

The Board shall appoint and fix the compensation and duties of a Chairperson of the John F. Kennedy Center for the Performing Arts, who shall serve as the chief executive officer of the Center, and a Secretary of the John F. Kennedy Center for the Performing Arts. The Chairperson and Secretary shall be well qualified by experience and training to perform the duties of their respective offices.

(2) Senior level executive and other employees

The Chairperson of the John F. Kennedy Center for the Performing Arts may appoint—

(A) a senior level executive who, by virtue of the background of the individual, shall be well suited to be responsible for facilities management and services and who may, without regard to the provisions of title 5, be appointed and compensated with appropriated funds, except that the compensation may not exceed the maximum rate of pay prescribed for level IV of the Executive Schedule under section 5315 of title 5; and

(B) such other officers and employees of the John F. Kennedy Center for the Performing Arts as may be necessary for the efficient administration of the functions of the Board.

(c) Transfer of property

Not later than October 1, 1995, the property, liabilities, contracts, records, and unexpended balances of appropriations, authorizations, allocations, and other funds employed, held, used, arising from, available to, or to be made available in connection with the functions transferred from the Secretary of the Interior pursuant to the amendments made by the John F. Kennedy Center Act Amendments of 1994 shall be transferred, subject to section 1531 of title 31, to the Board as the Board and the Secretary of the Interior may determine appropriate. Unexpended funds transferred pursuant to this subsection shall be used only for the purposes for which, and subject to the terms under which, the funds were originally authorized and appropriated.

(d) Transfer of personnel

(1) In general

Employees of the National Park Service assigned to duties related to the functions being undertaken by the Board shall be transferred with their functions to the Board not later than October 1, 1995.

(2) Rights and benefits

Transferred employees shall remain in the Federal competitive service and retain all rights and benefits provided under title 5. For a period of not less than 3 years after the date of transfer of an employee under paragraph (1), the transferred employee shall retain the right of priority consideration under merit promotion procedures or lateral reassignment for all vacancies within the Department of the Interior.

(3) Park Police

All United States Park Police and Park Police guard force employees assigned to the John F. Kennedy Center for the Performing Arts shall remain employees of the National Park Service.

(4) Costs

All usual and customary costs associated with any adverse action or grievance proceeding resulting from the transfer of functions under this section that are incurred before October 1, 1995, shall be paid from funds appropriated to the John F. Kennedy Center for the Performing Arts.

(5) Reorganization authority

Nothing contained in this section shall prohibit the Board from reorganizing functions at the John F. Kennedy Center for the Performing Arts in accordance with laws governing reorganizations.

(e) Review of Board actions

The actions of the Board relating to performing arts and to payments made or directed to be made by the Board from any trust funds shall not be subject to review by any officer or agency other than a court of law.

(f) Collective bargaining

(1) "Theatrical employee" defined

As used in this subsection, the term "theatrical employee" means a nonappropriated fund employee of the Board, who is engaged in a box office, performing, or theatrical trade that is the subject of a collective bargaining agreement as of January 1, 1994, including any change in the trade as a result of a technological advance.

(2) Collective bargaining

(A) In general

For the purposes of the National Labor Relations Act (29 U.S.C. 151 et seq.) and the Labor-Management Relations Act, 1947 (29 U.S.C. 141 et seq.)—

(i) each theatrical employee shall be considered to be an "employee" within the meaning of section 2(3) of the National Labor Relations Act (29 U.S.C. 152(3)); and

(ii) with respect to a theatrical employee, the Board shall be considered to be an "employer" within the meaning of section 2(2) of the National Labor Relations Act (29 U.S.C. 152(2)).

(B) Rights and obligations

With respect to each theatrical employee, the theatrical employee and the Board shall have all of the rights and obligations specified in such Acts.

(g) Pedestrian and vehicular access

Subject to approval of the Secretary of the Interior under section 76j(a)(2)(F) of this title, the Board shall develop plans and carry out projects to improve

pedestrian and vehicular access to the John F. Kennedy Center for the Performing Arts.

**20 U.S.C. § 76l**

**§ 76l. Official seal, Board vacancies and quorum, trustee powers and obligations, reports, support, services, and review and audit**

(a) Adoption of seal; Board function notwithstanding vacancies; quorum

The Board is authorized to adopt an official seal which shall be judicially noticed and to make such bylaws, rules, and regulations, as it deems necessary for the administration of its functions under this subchapter, including, among other matters, bylaws, rules, and regulations relating to the administration of its trust funds and the organization and procedure of the Board. The Board may function notwithstanding vacancies and twelve members of the Board shall constitute a quorum for the transaction of business.

(b) Powers and obligations of Board in respect of trust funds

The Board shall have all the usual powers and obligations of a trustee in respect of all trust funds administered by it.

(c) Annual report of operations and finances

The Board shall submit to the Smithsonian Institution and to Congress an annual report of the operations of the Board under this subchapter, including a detailed statement of all public and private moneys received and disbursed by it.

(d) Inspector General

The functions of the Board funded by funds appropriated pursuant to section 76r [1] of this title shall be subject to the requirements for a Federal entity under chapter 4 of title 5. The Inspector General of the Smithsonian Institution is authorized to carry out the requirements of such chapter on behalf of the Board, on a reimbursable basis when requested by the Board.

(e) Property and personnel compensation

(1) In general

The Board may procure insurance against any loss in connection with the property of the Board and other assets administered by the Board. Each employee and volunteer of the Board shall be considered to be a civil employee of the United States (within the meaning of the term

"employee" as defined in section 8101(1) of title 5), except that the Board shall continue to provide benefits with respect to any disability or death resulting from a personal injury to a nonappropriated fund employee of the Board sustained while in the performance of the duties of the employee for the Board pursuant to the workers compensation statute of the jurisdiction in which the John F. Kennedy Center for the Performing Arts is located. The disability or death benefits referred to in the preceding sentence, whether under the workers compensation statute referred to in the preceding sentence or under chapter 81 of title 5, shall continue to be the exclusive liability of the Board and the United States with respect to all employees and volunteers of the Board.

(2) Federal tort claims

For the purposes of chapter 171 of title 28, an employee of the Board shall be considered to be an "employee of the government" and the Board shall be considered to be a "Federal agency". No employee of the Board may bring suit against the United States or the Board under the Federal tort claims procedure of chapter 171 of title 28 for disability or death resulting from personal injury sustained while in the performance of the duties of the employee for the Board.

**20 U.S.C. § 76q**

**§ 76q. Sole national memorial to the late John F. Kennedy within the city of Washington and environs**

The John F. Kennedy Center for the Performing Arts, designated by this subchapter, shall be the sole national memorial to the late John Fitzgerald Kennedy within the city of Washington and its environs.